UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DAPHNE NERO, ) | Case No. 1:04CV1833 |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | JUDGE ANN ALDRICH |
| ) | |
| ) | |
| UNIVERSITY HOSPITALS ) | |
| MANAGEMENT SERVICES ) | |
| ORGANIZATION, et al., ) | |
| ) | |
| Defendants. ) | MEMORANDUM OF OPINION |

On August 11, 2004, Daphne Nero ("Nero") filed a complaint in the Cuyahoga County Court of Common Pleas against University Hospitals Health System raising various employment discrimination and public policy claims. (Doc. No. 1-6.)

On September 9, 2004, UH filed a petition for removal on the basis of federal question and pendent jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441, 1446. (Doc. No. 1-1.)

On December 8, 2004, Nero filed her first amended complaint to change the named defendant to University Hospitals Management Services Organization ("UH"). (Doc. No. 12.)

On January 3, 2005, Nero filed her second amended complaint to raise a Consolidated Omnibus Reconciliation Budget Act ("COBRA") claim and to add Defendant QualChoice Health Plan Inc. ("QualChoice") (Doc. No. 16.)

On September 1, 2005, this court dismissed, with prejudice, Nero's employment discrimination and public policy claims pursuant to a stipulated notice of dismissal under Rule 41(a)(1) of the Federal Rules of Civil Procedure. (Doc. Nos. 41, 42.) Thus, the sole claim before the court is the instant COBRA claim.

On September 19, 2005, the parties filed cross-motions for summary judgment. (Doc. Nos. 49-1, 50-1.) On October 19 and 24, 2005, they filed briefs in opposition. (Doc. Nos. 52-1, 53-1.) Finally, on November 11, 2005, UH filed a reply. (Doc. No. 54-1.)

All issues have been fully briefed and are ripe for adjudication. For the following reasons, Nero's motion for summary judgment (Doc. No. 49-1) is granted and UH's motion for summary judgment (Doc. No. 50-1) is denied.

## I.  FACTUAL BACKGROUND

Nero is a resident of Ohio, and at all relevant times, worked at UH as a Medical Assistant. (Doc. No. 16 "Compl.," at ¶2.) While employed at UH, she was covered under the QualChoice Health Care Plan. Id.

In November of 2000, Nero began working at UH. Id. at ¶5. On January 4, 2001, she was promoted to be Dr. Clifford Molin's full-time Medical Assistant. (Doc. No. 50-2 "Nero. Depo.," at 61.) Her responsibilities included, among other things, patient intake, patient follow-up, scheduling and confirming patient appointments, referrals, informing patients of test results, conducting certain diagnostic tests (such as blood tests), forwarding test results to the laboratory, and refilling prescriptions. (Nero Depo., at 65, Ex. 4.)

On September 24, 2001, Nero received a written warning for filing lab results in the wrong patient chart. (Doc. No. 50-3 "Molin Aff.," at ¶10.) On June 21, 2002, she received a final warning for failing to send out a broken halter monitor and lying to Dr. Molin about it. Id.; (Nero Depo., at 106-12.)

On March 1, 2004, Nero began experiencing medical problems arising out of a heart attack and a bout of excessive coughing, which fractured two ribs. Compl., at ¶6. Accordingly, she missed

work often during that month. Id. at ¶7. Around the same time, Dr. Molin started having problems with Nero's performance. On March 8, 2004, according to Dr. Molin, he learned that she did not complete a referral with regard to Patient G[1] to see his urologist, who was subsequently diagnosed with terminal prostate cancer. (Molin Aff., at ¶14; Nero Depo., at 135-43.) After learning about this incident, Dr. Molin reviewed his electronic medical files and determined that Nero did not follow up with patient care on several other occasions, including failing to schedule or confirm appointment dates, failing to notify patients of test results, and failing on one occasion to complete a mammogram notice and follow up questionnaire. Id. at ¶16. On March 11, 2004, he learned that Nero mislabeled a blood requisition with the wrong patient name. Id. at ¶17. Finally, on March 28, 2004, he received a two-page letter from Patient A detailing a list of complaints about Nero. Id. at ¶18. Patient A complained that she was unable to get referral information and prescription refills. Id.

On March 28, 2004, Nero contacted UH about returning to work. Compl., at ¶10. On April 20, 2004, her employment was terminated due to poor performance. Id. at ¶12. Thereafter, Nero alleges that UH and QualChoice failed to notify her of her right to elect continuing coverage under COBRA. Specifically, she alleges that they failed to notify her, within 14 days of her termination, that she had a right to elect continuing coverage for 18 months following her termination, and that she had 60 days upon her termination to exercise that right (and 45 days after that election to make her first premium payment). Compl., at ¶¶43-45, 48-51. She further alleges that UH failed to notify QualChoice of her termination. Id. at ¶ 46-47.

After her termination, she made at least four visits to UH doctors to receive treatment for a broken ankle. (Doc. No. 49-2 "Nero Aff.," at ¶4.) She claims that she stopped treatment because

---

[1] The Parties have agreed not to disclose patient names. (Doc. No. 24.)

she was uninsured and could not afford to pay her medical bills. She is seeking (1) statutory damages in the amount of $47,200, (2) attorneys' fees and costs in the amount of $21,000, (3) an order requiring UH to forgive any outstanding medical bills from April 20, 2004 to the present, and (4) an order granting her an opportunity to elect continuing coverage for an additional 18 months. (Doc. No. 49-1, at 11.) UH has since waived all of her post-termination medical bills and has offered her the opportunity to elect continuing coverage for the next 18 months, from September of 2005 until February of 2007. (Doc. No. 53-1, at 2.) Thus, Nero's claim for relief is limited to statutory damages and attorneys' fees and costs.

In her motion for summary judgment, Nero argues that UH has not provided any evidence that it sent any COBRA notice. In its motion for summary judgment, UH argues that it had good faith procedures in place to comply with COBRA and thus, it should be absolved of any liability. Also, it argues that because Nero was terminated for gross misconduct, she was never entitled to any such notice. Finally, it argues that because there is no evidence of bad faith on its part and because Nero has not suffered any prejudice, the court should not award her statutory damages and attorneys' fees and costs.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The party moving for summary judgment has the initial burden to either (1) present affirmative evidence negating an element of the non-movant's claim or (2) demonstrate "an absence

of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once that burden is met, the non-movant must set forth sufficient evidence to create a genuine issue of material fact. Klepper v. First Am. Bank, 916 F.2d 337, 342 (6th Cir. 1990). To avoid summary judgment, the non-movant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

All reasonable factual inferences must be drawn in favor of the non-movant. Humenny v. Genex Corp., 390 F.3d 901, 904 (6th Cir. 2004) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). However, "the mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Indeed, "[a] mere scintilla of evidence is insufficient; rather there must be evidence on which a jury could reasonably find for the non-movant." Humenny, 390 F.3d at 904 (internal quotation omitted).

When evaluating cross-motions for summary judgment, the court is obligated to analyze each motion on its own merits and view facts and inferences in the light most favorable to the non-movant. Westfield Ins. Co. v. Tech Dry Inc., 336 F.3d 503, 506 (6th Cir. 2003).

### III. LEGAL ANALYSIS

Under COBRA, a plan sponsor of a group health plan "shall provide . . . that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan." 29 U.S.C. § 1161(a). The termination of an employee, for any reason other than the employee's own gross misconduct, constitutes a "qualifying event." 29 U.S.C. § 1163(2).

An employer is required to notify the plan administrator of a qualifying event within 30 days of the qualifying event. 29 U.S.C. § 1166(a)(2). Thereafter, the plan administrator must notify the employee within 14 days of his or her rights and allow 60 days to elect continuing coverage. 29 U.S.C. §§ 1165(a); 1166(a)(3)-(4) & (c). In the case of a single qualifying event, an employee is entitled to elect continuing coverage for up to 18 months following the qualifying event. 29 U.S.C. § 1162(2)(a)(i). The plan may also require the payment of a premium for continuing coverage so long as it does not exceed 102 percent of the applicable premium for such period and the employee is not required to pay such premium until 45 days after he or she makes the decision to elect continuing coverage. 29 U.S.C. § 1162(3).

Here, Nero maintains that she never received her COBRA notice within the statutory time frame and UH has not offered any evidence to rebut her, other than its sincere belief that a notice was sent. It did not retain a copy of the alleged notice, however, and there is simply no evidence in the record to support its belief. Moreover, the termination checklist in Nero's employment record has blank lines next to the phrases, "COBRA sent" and "send COBRA," indicating that the notice was never sent. (Doc. No. 49-5.) Thus, UH has not offered any evidence from which a reasonable juror could conclude that a COBRA notice was sent to Nero.

UH makes two arguments in response. First, it argues that because it maintains good faith procedures for sending out COBRA notices through a computer system called "Oracle," it should be absolved of liability. It is true that several courts have held that a good faith attempt to comply with COBRA's notice requirements is sufficient under the statute. See Smith v. Rogers Galvanizing Co., 128 F.3d 1380, 1383 (10th Cir. 1997) (collecting cases). "Thus, the issue is not whether the former employee actually received notice; the issue is whether the plan administrator 'caused the

-6-

notice to be sent in a good faith manner reasonably calculated' to reach the former employee." Keegan v. Bloomingdale's, Inc., 992 F. Supp. 974, 976 (N.D. Ill. 1998) (quoting Jachim v. KUTV Inc., 783 F. Supp. 1328, 1333-34 (D. Utah 1992)). The problem with UH's position is that it confuses a "good faith procedure" with a "good faith attempt." Indeed, in almost all of the cases cited by UH, the employer either notified the employee orally or sent a certified letter to the employee's last known address. See e.g. Degruise v. Sprint Corp., 279 F.3d 333, 337 (5th Cir. 2002); Smith, 128 F.3d at 1383-84; Keegan, 992 F. Supp. at 976; Lawrence v. Jackson Mack Sales, 837 F. Supp. 771, 782 (S.D. Miss. 1992); Conery v. Bath Assoc., 803 F. Supp. 1388, 1398 (N.D. Ind. 1992); Branch v. G. Bernd Co., 764 F. Supp. 1527, 1534 n.11 (M.D. Ga. 1991). UH is unable, however, to cite a single decision that has held that the mere existence of a computerized notice procedure is sufficient to satisfy COBRA, especially when there is no evidence that the procedure was actually initiated. Under UH's interpretation, a COBRA plaintiff would never be able to prevail on the merits. Thus, UH's first argument lacks merit.

Second, UH argues that because Nero was terminated for gross misconduct, she was not entitled to a COBRA notification. It is true that under COBRA, employees who are terminated for gross misconduct are not entitled to elect continuing coverage. 29 U.S.C. § 1163(2). The term "gross misconduct" is not defined in the statute, but has generally been understood to include misconduct that is "intentional, wanton, willful, deliberate, reckless or in deliberate indifference to an employer's interest." Collins v. Aggreko, Inc., 884 F. Supp. 450, 454 (D. Utah 1995). "It is misconduct beyond mere minor breaches of employee standards, but conduct that would be considered gross in nature." Id.

In evaluating the case law, the court notes that conduct that amounts to a simple mistake or

-7-

mere inattention to detail has been considered relatively benign. See e.g. Lloyd v. Hanover Foods Corp., 72 F. Supp. 2d 469 (D. Del. 1999) (concluding that a failure to add onion powder to several batches of ravioli does not constitute gross misconduct). In comparison, conduct that has been far more wanton does constitute "gross misconduct." See e.g. Nakisa v. Continental Airlines, 2001 U.S. Dist. LEXIS 8952 (S.D. Tex. May 9, 2001) (using a racial epithet and throwing an apple at a fellow employee); Zickafoose v. UB Servs., Inc., 23 F. Supp. 2d 652 (S.D. W. Va. 1998) (severely beating a fellow employee); Collins, 884 F. Supp. at 454 (driving a company vehicle while intoxicated); Burke v. American Stores Employee Benefit Plan, 818 F. Supp. 1131 (N.D. Ill. 1993) (criminal theft); Conery v. Bath Assoc., 803 F. Supp. 1388 (N.D. Ind. 1992) (embezzling company funds); Adkins v. United Int'l Investigative Servs., Inc., 1992 U.S. Dist. LEXIS 4719 (N.D. Cal. Mar. 27, 1992) (deserting security post and falsifying log to earn extra paycheck). Thus, in most cases, the distinction between gross misconduct and a simple mistake is quite clear. This is not one of those cases.

This case is a close call because although Nero made some mistakes as an employee at UH, those mistakes had potentially serious consequences. UH, however, has not offered any evidence to suggest that Nero engaged in any intentional, wanton, willful, or deliberate misconduct.[2] In fact, nothing in the record indicates that her behavior was the result of anything other than absentmindedness. Clearly, her performance was substandard. However, regardless of its consequences, a mistake is still a mistake. Otherwise, all mistakes in the medical field would constitute gross misconduct because such mistakes carry serious consequences with them. Thus,

---

[2] The court rejects UH's argument that because Nero voluntarily dismissed her discrimination claims, she "effectively conceded" that she engaged in gross misconduct.

-8-

the filing of lab results in the wrong chart or the mislabeling of a blood sample, though having potentially serious consequences, does not constitute gross misconduct absent any evidence that the action was intentional, wanton, willful, or deliberate.  Similarly, failing to follow through with a patient referral or a prescription refill does not constitute gross misconduct absent any evidence that it was anything more than a mistake.[3]

UH relies heavily upon Bryant v. Food Lion Inc., 100 F. Supp. 2d 346 (D.S.C. 2000) in arguing that because Nero engaged in a pattern of insubordination, her behavior constitutes gross misconduct.  The court agrees that repetitive insubordination constitutes gross misconduct.  However, Bryant is distinguishable because in that case, the plaintiffs were terminated for their *continuous refusal* to perform certain tasks.  Id. at 360, 363.  Here, there is no evidence that Nero refused to follow Dr. Mollin's directives; the evidence simply suggests that she was perhaps a forgetful employee who lacked an attention to detail.  Moreover, the fact that UH has only discovered a handful of incidents in which she failed to follow up with a patient during three years of employment undercuts any suggestion that Nero's conduct was deliberate.  Although UH was well within its right to terminate her employment, Congress clearly expected an employee's conduct to be much more wanton and deliberate before losing the right to elect continuing health care coverage.  See Zickafoose, 23 F. Supp. 2d at 655 (finding that gross misconduct must be so outrageous, extreme, and unconscionable that it truly "shocks the conscience").  Thus, albeit a close call, UH's second argument lacks merit.

Because UH has not offered any evidence that a COBRA notice was sent, Nero's motion for

---

[3]  Moreover, the fact that UH has continually maintained that it did send Nero a COBRA notice undercuts its position that she was never entitled to one because she was terminated for engaging in gross misconduct.

summary judgment is granted. Also, because UH has not offered any evidence excusing its failure to comply with COBRA's notification requirements, its motion for summary judgment is denied. The only remaining issue is whether this court should award statutory damages and attorneys' fees and costs.

COBRA's civil enforcement provision provides for statutory damages of up to $100 per day for failing to abide by its notice requirements and reasonable attorneys' fees and costs. 29 U.S.C. §§ 1132(c)(1) & (3), (g)(1). The award of statutory damages is left to the discretion of the district court, although some courts will not impose penalties in the absence of bad faith or prejudice. Bartling v. Fruehauf Corp., 29 F.3d 1062, 1068 (6th Cir. 1994). According to Nero's affidavit, she stopped receiving treatment for a broken ankle because she could not afford to pay her medical bills. (Nero Aff., at ¶4.) Moreover, an employee need not demonstrate harm in bringing a civil enforcement action under COBRA. See Chenoweth v. Wal-Mart Stores, Inc., 159 F. Supp. 2d 1032, 1042 (S.D. Ohio 2001). Rather, "[t]he penalty provisions of § 1132(c) were intended to induce compliance by plan administrators." Phillips v. Riverside, Inc., 796 F. Supp. 403, 411 (E.D. Ark. 1992) (citing Paris v. F. Korbel & Bros., Inc., 751 F. Supp. 834, 839-40 (N.D. Cal. 1990)). As some courts have recognized, COBRA compliance does not create an onerous burden on plan administrators, "while the result of noncompliance could be disastrous for the discharged employee." Id. (Citing Paris, 751 F. Supp. at 840). Thus, to impress upon UH the importance of such compliance, the court orders UH to pay a statutory penalty of $7,020.00, which represents a $15 per day penalty for 468 days, from June 4, 2004 (45 days after Nero's termination) to September 15, 2005 (the date when UH allowed Nero to elect continuing coverage).

With regard to attorney's fees and costs, courts generally evaluate five factors:

(1) the degree of the opposing party's culpability or bad faith;

>   (2) the opposing party's ability to satisfy an award of attorney's fees;
>   (3) the deterrent effect of an award on other persons under similar circumstances;
>   (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and
>   (5) the relative merits of the parties' positions.

Armistead v. Vernitron Corp., 944 F.2d 1287, 1301 (6th Cir. 1991) (quoting Secretary of Dep't of Labor v. King, 775 F.2d 666, 669 (6th Cir. 1985). The Sixth Circuit has held that none of these factors is dispositive and that the district courts have discretion to "take into consideration any of the legitimate, relevant purposes for which fee-shifting has been permitted or proposed, including punishing bad faith litigants, providing the plaintiff with complete relief in appropriate cases, preventing the unjust enrichments of those who benefit from successful litigation, or removing deterrents to meritorious litigation by reducing the disparity between the resources available to the parties." Id. at 1303.

Here, there is no evidence of bad faith on the part of UH, although the court does note that UH continues to maintain that a COBRA notice was sent even though nine months of discovery has failed to produce any evidence in support of that position. With regard to the remaining factors, UH certainly has the ability to satisfy an award of attorneys' fees and costs and such an award will not only create a deterrent effect to protect future employees, but will also provide Nero with complete relief. Thus, the court orders an award of attorneys' fees and costs.

However, the court agrees that Nero is not entitled to all of her attorneys' fees and costs given that much of this litigation arose out of claims of employment discrimination, which were voluntarily dismissed with prejudice after extensive discovery. Accordingly, the court will not award attorneys' fees and costs for any work performed prior to December 14, 2004 because that work occurred before plaintiff's counsel began researching a potential COBRA claim. (Doc. No. 49-6.) With regard to work performed between December 14, 2004 and August 30, 2005 (the date

-11-

the non-COBRA claims were dismissed), the court will award attorneys' fees and costs for work exclusively related to the COBRA claim.  Under the court's calculation, that amount comes to $1,300.20.[4]  Finally, the court will award attorney's fees and costs for all work performed after August 30, 2005 because that work occurred after Nero dismissed her non-COBRA claims.  Under the court's calculation, that amount comes to $1,127.50.[5]  Thus, the total award of attorneys' fees and costs is $2,427.70 ($1,127.50 + $1,300.20).  However, plaintiff's counsel has since filed an opposition brief (Doc. No. 52) and the court awards reasonable attorneys' fees and costs associated with the researching, drafting, and filing of that brief as well.

### IV.  CONCLUSION

For the foregoing reasons, Nero's motion for summary judgment (Doc. No. 49-1) is **GRANTED** and UH's motion for summary judgment (Doc. No. 50-1) is **DENIED**.  Judgment is entered in favor of Nero in the amount of $7,020.00 in statutory damages and $2,427.70 in attorney's fees and costs.  The court also awards reasonable attorneys' fees and costs associated with the researching, drafting, and filing of Nero's opposition brief (Doc. No. 52).

This judgment is final and appealable.

IT IS SO ORDERED.

      /s/ Ann Aldrich
      ANN ALDRICH
      UNITED STATES DISTRICT JUDGE

Dated:  October 12, 2006

---

[4]    $50.00 (12/14/04) + $130.00 (12/15/04) + $100.00 (12/15/04) + $360.00 (12/16/04) + $60.00 (12/17/04) + $25.00 (12/29/04) + $55.00 (07/27/05) + $110.00 (08/02/05) + $387.50 (08/30/05) = $1277.50 in attorney's fees and $0.20 (12/14/04) + $22.50 (12/16/04) = $22.70 in other costs; for a total of $1300.20.  (Doc. No. 49-6.)

[5]    $137.50 (08/31/05) + $160.00 (09/01/05) + $125.00 (09/01/05) + $650.00 (09/02/05) + $55.00 (07/26/06) = $1,127.50 in attorney's fees.  (Doc. No. 49-6.)